Filed 12/2/13  Lyman v. Plymouth Empire Properties CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

|  |  |
|---|---|
| JOSH LYMAN et al., | C070973 |
| Plaintiffs, Cross-defendants and Appellants, | (Super. Ct. No. 08CV5212) |
| v. | |
| PLYMOUTH EMPIRE PROPERTIES, INC., | |
| Defendant, Cross-complainant and Respondent; | |
| IONE BAND OF MIWOK INDIANS, | |
| Defendant and Respondent. | |

This case stands for the simple proposition that it is not an abuse of discretion to deny an equitable easement to landowners who purchased landlocked property knowing they did not have legal access to the land and who had been told they needed to secure an easement before purchasing the property.  We reject plaintiffs Josh and Julie Lyman's distortion of the standard of review as well as their misreading of the leading authority on

1

equitable easements and affirm the judgment, rejecting their attempt to quiet title to an easement over property owned by defendants Plymouth Empire Properties, Inc. (PEP), and the Ione Band of Miwok Indians (the Tribe). However, we must reverse the judgment insofar as it awards $100 in damages to PEP for trespass because we conclude there is insufficient evidence to support the finding.

## FACTS

At the heart of this controversy is the so-called "County Road 81," which is not a county road at all. For some period of time many years ago the road was designated "County," but Amador County never improved or maintained the road, and eventually the fact the public held no rights in the road was clarified in a reverse quiet title action. The judgment held that "County Road 81" never was a county road. Nevertheless, "County Road 81," which is little more than a dirt track, traverses property owned by defendants PEP and the Tribe, and provides ingress and egress to several property owners, including plaintiff Josh Lyman's brother, Jared Lyman. In 2004 PEP installed several permissive use signs along the road. There is also a sign stating "Private Road."

Indeed, Jared purchased his land before plaintiffs purchased theirs and negotiated the purchase of an access easement from defendant PEP. Other neighbors, the Allisons, have been granted permission to access their property. Before plaintiffs purchased their property, Carol Emerson, a vice-president at PEP, told plaintiff Josh Lyman that he needed to secure an easement for ingress and egress. The title reports confirmed that there was no recorded access to the parcels. Plaintiff Josh Lyman acknowledged that at the time of purchase he was aware there was no legal access to the property. He knew it was not a public road. He assumed he had a right to use a county road and he assumed, despite advice to the contrary, that he did not need to secure any access rights.

After purchasing the property, plaintiffs traveled over defendants' property on County Road 81 to access their property. They have not spoken to other neighbors about alternative access to their property, including the adjoining land to the east known as

2

Montevina Vineyards. Historically, people have also used a road across the Montevina vineyards for access to plaintiffs' land and other property in the area.

PEP has plans to develop its property, and the location of the road would impair its ability to either sell the property or fully develop it. The grant of the easement would also encumber the Tribe's ability to build housing or pursue solar or broadband development, which might require moving the road.

The trial court's findings are blunt. "The conclusion is inescapable that Plaintiffs simply 'rolled the dice', and it is astonishing that anyone would consummate a purchase under such circumstances as shown by the evidence here. Having been told by Ms[.] Emerson there was no access to the parcels Plaintiffs proposed to purchase, without any investigation with Amador County officials and records or requirement that the buyers ensure the parcels had access and going forward on the chance their assumption was correct, Plaintiffs cannot be said to be 'innocent' in respects of the present controversy. Plaintiffs' actions are fairly characterized as willful, or at very least, as grossly negligent, and through their conduct alone, have caused the controversy by encroaching on the property of their neighbors."

The court expressly considered the hardship to defendants if an easement were imposed. "The road in issue crosses a sensitive portion of the land of the Defendants. Evidence established, as did the courts' view of the site, that the only propitious portion of the Tribe's parcel for most development, the level portion, is the area traversed by the road, as immediately south of the road the land drops off steeply and is cut by ravines. The testimony of the Tribe's administrator made clear the fact that without the flexibility to deal with a user of the road as they have with the Jared Lyman and Allison families, the development potential of their parcels is constrained. Similarly, the value of PEP and Tribe land would be compromised by the existence of an easement over which they have no effective ability to impose limits on use or effect its relocation to accommodate their development interests. The attractiveness of PEP land to the Tribe or any other potential

3

purchaser would be adversely affected by imposition of an easement for use by Plaintiffs." The grant of an equitable easement was denied.

As to PEP's cross-complaint for trespass, the court entered judgment in favor of PEP and granted damages of $100. The trespass cause of action was based on the construction of a "$20 fence" on PEP's property. Plaintiff Josh Lyman testified he did not construct the fence, nor did he instruct others to do so. No one testified who actually constructed the fence. One of PEP's representatives testified that he saw plaintiffs' livestock grazing on PEP property.

As to the $20 fence, the trial court found that "not until Plaintiffs bought and began fencing their property was there an issue of where cattle would roam in the area, and given that they had an obvious interest in containing their cattle and excluding others, the greater likelihood is that they caused the disputed fence to be erected." The court also explained, "[T]estimony by Mr. Monaghan established that cattle bearing Plaintiffs' brand were grazing within the strip of PEP land between Plaintiffs' and the Vineyard/push gate and contained by the '$20 fence'. The weight of the evidence is that Plaintiffs' caused the fence to be placed between the fence post corner on their property and fencing on the PEP-Montevina property line. Cost of removal of the several posts and strung wire is nominal, certainly not more than $100, and such sum is awarded to PEP which may itself cause its removal. No evidence was presented nor were damages sought for loss of use of the portion of PEP property south of the fence from the time it appeared."

The case was tried on theories of easement by prescription, implication/necessity, and equity/balance of the hardships. Pursuant to section 631.8 of the Code of Civil Procedure, the court granted defense motions as to the theories of prescription and implication. On appeal, plaintiffs do not challenge those rulings. At issue is the denial of a grant of an equitable easement and trespass.

4

# DISCUSSION

## I

### *Standard of Review*

"In appropriate cases in which the requirements for traditional easements are not present, California courts have exercised their equity powers to fashion protective interests in land belonging to another, sometimes referring to such an interest as an 'equitable easement.' " (*Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1008 (*Tashakori*).) Plaintiffs' first obstacle is the deferential and limited scope of appellate review. "When reviewing a trial court's exercise of its equity powers to fashion an equitable easement, we will overturn the decision only if we find that the court abused its discretion." (*Ibid.*)

Plaintiffs insist, however, that we must independently review the trial court's ruling because "the legal inquiry requires an evaluation of whether the legal principles of negligent and willful conduct were incorrectly interpreted and applied by the Trial Court to the doctrine of relative hardship, and to the legal concept of 'innocent encroachment'. " Plaintiffs' reliance on *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 (*Crocker*) is misplaced.

First, *Crocker* is a tax case and does not involve an equitable easement. It does involve the classification of an item of personal property as a fixture for purposes of taxation. The Supreme Court explained that "[t]axation must, of course, be uniform and the tax laws uniformly applied. [Citation.] Uniformity depends on proper classification. And proper classification is furthered through the application of independent review." (*Crocker*, *supra*, 49 Cal.3d at pp. 888-889.) Thus, "the pertinent inquiry bears on the various policy considerations implicated in the solution of the problem of taxability, and therefore requires a critical consideration, in a factual context, of legal principles and their underlying values." (*Id*. at p. 888.)

5

Second, the taxability question "reduces itself to whether a reasonable person would consider the item to be a permanent part of the property . . . ." (*Crocker*, *supra*, 49 Cal.3d at pp. 887-888.) An appellate court is as well equipped as the trial court to apply the reasonable person standard in deciding classification issues that would support a uniform tax policy. (*Ibid*.)

By contrast, the questions to be resolved by a trial court in deciding whether to grant an equitable easement are unique to the factual context and unrelated to any policy of uniformity. Simply put, the question is not predominantly legal. Rather, the court must resolve what individual landowners believed and what they did—inherently factual questions. *Crocker* is inapposite.

Indeed, in cases involving equitable easements the chorus is harmonious. Because the trial court exercised its equity powers when fashioning an easement, "we review the judgment under the abuse of discretion standard." (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 771 (*Hirshfield*).) "The question whether the defendant's conduct is so egregious as to be willful or whether the quantum of the defendant's negligence is so great as to justify an injunction is a matter best left to the sound discretion of the trial court." (*Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 267 (*Linthicum*); accord, *Zanelli v. McGrath* (2008) 166 Cal.App.4th 615, 638.) We turn, therefore, to a review of the record to determine whether the trial court abused its discretion in deciding that plaintiffs' conduct was "fairly characterized as willful, or at the very least, as grossly negligent" and that they "effectively sought to 'extort' their neighbors." We can find no abuse of discretion in the court's conclusion that "it would be a manifest injustice, akin to extortion" to burden defendants with an easement.

## II

### *Equitable Easement*

Plaintiffs' appeal is premised on a misunderstanding of what they characterize as the "common law" regarding equitable easements. They insist that negligence is

6

equivalent to the type of innocent encroachment that justified equitable easements in *Linthicum* and *Tashakori*. While both cases offer a helpful template in reviewing a trial court's exercise of discretion in granting an equitable easement, neither case is factually analogous to the case before us. They do, however, deserve close examination.

In *Linthicum*, the plaintiffs' neighbors had used a roadway over the plaintiffs' land for many years, believing they had an easement from the United States Forest Service. (*Linthicum*, *supra*, 175 Cal.App.4th at pp. 263-264.) The plaintiffs bought the parcel and sought to enjoin the neighbors' use of a road that provided the sole access to their properties. (*Id*. at p. 262.) No alternative access could be constructed. (*Id*. at p. 265.) In exercising its discretion to deny the plaintiffs' request for injunctive relief, the court considered the following factors: " '1. Defendant must be innocent—the encroachment must not be the result of defendant's willful act, and perhaps not the result of defendant's negligence. In this same connection the court should weigh plaintiff's conduct to ascertain if he is in any way responsible for the situation. 2. If plaintiff will suffer irreparable injury by the encroachment, the injunction should be granted regardless of the injury to defendant, except, perhaps, where the rights of the public will be adversely affected. 3. The hardship to defendant by the granting of the injunction must be greatly disproportionate to the hardship caused plaintiff by the continuance of the encroachment and this fact must clearly appear in the evidence and must be proved by the defendant. But where these factors exist, the injunction should be denied, otherwise, the court would lend itself to what practically amounts to extortion.' [Citation.]" (*Id*. at p. 265.)

The trial court found that the plaintiffs purchased the parcel with full knowledge of the historical use of the roadway and nevertheless sought to deprive their neighbors of the value and use of their properties. (*Linthicum*, *supra*, 175 Cal.App.4th at p. 266.) The court also found that the roadway did not substantially interfere with the plaintiffs' right to use and develop their property, yet the neighbors would suffer a catastrophic loss if denied access to their properties. (*Ibid*.) The Court of Appeal affirmed the trial court's

7

denial of the request for an injunction, finding that the court "acted well within its discretion in denying the injunction." (*Id*. at p. 267.)

The equities were just as apparent and imbalanced in *Tashakori*. In *Tashakori*, as in the instant case, the trial court was asked to exercise its inherent equitable power to fashion an equitable easement rather than to enjoin an encroachment as in *Linthicum*. "[T]he courts are not limited to judicial passivity as in merely refusing to enjoin an encroachment. Instead, in a proper case, the courts may exercise their equity powers to affirmatively fashion an interest in the owner's land which will protect the encroacher's use." (*Hirshfield*, *supra*, 91 Cal.App.4th at p. 765.)

In *Tashakori*, as in *Linthicum*, one of the parties was innocent. The Tashakoris bought a parcel "with the innocent belief that an easement to the public road existed." (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1010.) They later subdivided the parcel into two, but both parcels shared a common driveway. They sold one of the parcels, which, unbeknownst to them, left their remaining lot landlocked. (*Id*. at p. 1005.)

The trial court found that the owners of the other parcel would "suffer virtually no harm at all from the Tashakoris' use of the shared driveway to access Lot 18, and that the Tashakoris would be irreparably harmed if their sole means of accessing their property were denied." (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1010.) The court granted an equitable easement over the common driveway, and the Court of Appeal affirmed. (*Id*. at pp. 1005-1006.)

Plaintiffs' spin on cases favorable to defendants is disingenuous. They insist that their predicament is at least as innocent as the neighbors in *Linthicum*, who years earlier had been asked by the Forest Service to renew their special unit permits but failed to do so. Those neighbors, plaintiffs argue, assumed like they did that either the roadway was public or that they had an easement to use it, but they did not verify the legal status of the land before they purchased it. Nevertheless, the court characterized their encroachment as innocent. Plaintiffs complain that the trial court did not apply the same rationale to

8

their situation, an equally innocent encroachment based on their mistaken belief that County Road 81 was a public road and/or they had the right to use it because otherwise their property was landlocked.

But plaintiffs simply dismiss all the facts that distinguish their willful or grossly negligent conduct from the innocent encroachment the court found in *Linthicum*. Before plaintiffs purchased the property, Carol Emerson, a shareholder and board member of defendant PEP, personally told plaintiff Josh Lyman that he needed an easement for ingress and egress to access the property. The title reports confirmed the same fact— "[t]he lack of a right of access recorded in insurable form to and from said land to a public street" and the "[l]ack of right of recorded access to and from said premises." From their conversations and the title reports, therefore, plaintiffs were aware and understood before buying the property that there was no recorded legal access to it.

Based on this evidence, the court determined that plaintiffs had merely " 'rolled the dice,' " and purchasing the property with the knowledge they had no legal access was "astonishing." In the court's view, their "actions are fairly characterized as willful, or at very least, as grossly negligent, and through their conduct alone, have caused the controversy by encroaching on the property of their neighbors." There is ample evidence to support the trial court's finding, and we can find no abuse of discretion in refusing to grant an easement in equity when the purchasers bought a parcel they knew was landlocked and made no attempt to negotiate an easement before consummating the sale.

Plaintiffs' conduct was more akin to the property owner in *Linthicum* who, knowing his neighbors had used a roadway over the parcel he planned to purchase, bought it anyway and then attempted to enjoin his neighbors' use. The trial court had little difficulty in assessing the relative equities. The neighbors had used the roadway for many years before discovering any potential problem, a problem they believed was resolved when the Forest Service did not provide them the promised permit. (*Linthicum*, *supra*, 175 Cal.App.4th at p. 264.) Unlike plaintiffs, they had no notice prior to

9

purchasing their property that they did not have the legal right to use the roadway. Plaintiffs, like their counterparts in *Linthicum*, bought their property with knowledge of the facts and gambled anyway. In both cases the trial courts, sitting in equity, did not abuse their discretion by aborting the plaintiffs' attempts to take advantage of their neighbors.

Nor can plaintiffs compare their nonchalant approach to proceeding with the purchase of property they knew lacked legal access with the diligent investigation undertaken by the landowners in *Tashakori*. The trial court found they "reasonably relied on inaccurate representations by the real estate broker and the prior owner, and the legal description contained in the preliminary title report" and believed that there was a recorded easement that allowed access. (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1007.) Plaintiffs, on the other hand, willfully ignored the information they received from the title reports and from defendant PEP, and ask us to save them from their recklessness at defendants' expense. This we cannot do.

Moreover, plaintiffs have a misguided notion that their conduct was somehow irrelevant because others had used County Road 81 as a public road long before they ever purchased the property. In other words, even if their conduct was willful or negligent, they could rely on the innocent conduct of others who "created" the encroachment. There is no authority for their argument; indeed, it is at odds with the principles reiterated in the cases they cite regarding equitable easements.

In these cases the courts balance the equities between the persons encroaching on another's land and the landowners. "The 'relative hardship' test helps courts assess whether to deny injunctive relief to a property owner and instead grant an equitable easement to the encroaching user. To create an equitable easement, 'three factors must be present. First, the defendant must be innocent. That is, his or her encroachment must not be willful or negligent. The court should consider the parties' conduct to determine who is responsible for the dispute. Second, unless the rights of the public would be

10

harmed, the court should grant the injunction if the plaintiff "will suffer irreparable injury . . . regardless of the injury to defendant." Third, the hardship to the defendant from granting the injunction " ' "must be greatly disproportionate to the hardship caused plaintiff by the continuance of the encroachment and this fact must clearly appear in the evidence and must be proved by the defendant. . . ." [Citation.]' [Citation.]" (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1009.)

As noted above, plaintiffs cannot surmount the first hurdle—their conduct was not innocent. The trial court's findings, supported as they are by substantial evidence, were sufficient to deny the equitable easement. But the trial court addressed the second and third factors as well, concluding that the easement would unfairly limit the development potential for both defendants. Plaintiffs complain that whatever limitation on development potential defendants might conceivably suffer pales in comparison to the irreparable injury they will suffer when their property becomes landlocked.

We need not weigh in on this controversy. The trial court noted that plaintiffs had failed to explore any alternative easements over other neighbors' property. Whether or not they did or should have does not change the pivotal finding that the dispute was of plaintiffs' own doing. We note that doubtful cases should be decided in favor of the landowner and not the encroacher. (*Linthicum*, *supra*, 175 Cal.App.4th at p. 266.) Here there is not even room for doubt. Plaintiffs knew what they were buying, knew they did not have legal access to the property, bought it anyway, and then attempted, as the trial court found, to extort their neighbors. On this record, we cannot say the trial court abused its discretion in denying them an equitable easement.

## III

### *Trespass*

Defendant PEP cross-complained for trespass based on the appearance of a $20 fence on its property. Plaintiffs appeal the $100 damage award to cover the cost of

removing the fence. They contend there is no substantial evidence to support a finding that they constructed or instructed anyone else to construct the fence. We must agree.

Plaintiff Josh Lyman testified he did not install the fence, nor did he have anyone install it on his behalf. Defendant PEP presented no evidence as to who constructed the fence or when it was done. The court's finding was based solely on the inference it drew that plaintiffs benefited from the existence of the fence. But since there was no evidence to substantiate when the fence appeared, it is pure speculation that plaintiffs alone benefited from it. In fact, plaintiff Josh Lyman testified that there was a tenant on this section of PEP's land who was running cattle and was concerned that those cattle would get off his property. According to plaintiffs, the fence benefited the tenant because it restrained the cattle grazing on the PEP property from entering onto other parcels.

We agree with plaintiffs that a " 'mere scintilla of evidence need not be affirmed on review.' [Citation.]" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation] . . . ." (*Ibid*.) Inferences that are the result of mere speculation or conjecture cannot support a finding. (*Ibid*.) The trial court's finding rests not on the evidence, but on mere speculation and conjecture.

## DISPOSITION

The judgment is reversed insofar as it awards damages to PEP of $100 for trespass; in all other respects, the judgment is affirmed. Respondents shall recover costs on appeal.

                                        _____RAYE_____, P. J.

We concur:

_____ROBIE_____, J.

_____HOCH_____, J.

12